**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | Case No. 2:25-cr-20347 |
| v. | Hon. Nancy G. Edmunds |
| D-2 JAMES RAHAIM, | |
| Defendant. | |

---

**DEFENDANT JAMES RAHAIM'S SENTENCING MEMORANDUM**

---

Lucius Annaeus Seneca, a wise Roman philosopher once wrote, "A good prince follows up crime, yet keeps in mind the man whom he is punishing." Seneca, *De Clementia* (On Mercy), Book II. It is in this sense that the individual who must impose punishment invariably bears the responsibility, if not the moral obligation, to exercise restraint when warranted. Mr. Rahaim stands before this Court a man humbled by his own actions. He has accepted responsibility for his conduct by pleading guilty to Counts 2 and 3 of the Information—Wire Fraud, in violation of 18 U.S.C. § 1343, and False Oath in Bankruptcy, in violation of 18 U.S.C. § 152(2). He now asks this Court to understand him as a complete person, husband and father, rather than the individual described during this regrettable chapter. This memorandum asks the Court to impose a sentence that reflects the § 3553(a) factors in their totality – one that addresses Mr. Rahaim's relevant conduct while also recognizing the substantial mitigating factors, which include his limited role, the tremendous strides he has made and can make towards making his victims whole, as well as his realistic potential for rehabilitation.

1

For the reasons set forth below—including the sentencing data published by the United States Sentencing Commission, the Judiciary Sentencing Information ("JSIN") data contained in the Presentence Investigation Report, the personal history and characteristics of the defendant, and the § 3553(a) factors—the defense respectfully requests that this Court impose a non-custodial sentence consisting of a period of time served and a term of home confinement as a condition of supervised release, together with restitution.

I.   **THE JSIN DATA IN THE PRESENTENCE REPORT SUPPORTS A SENTENCE WELL BELOW THE ADVISORY GUIDELINE RANGE**

The parties have agreed to a total offense level of 16 and a criminal history category of I, yielding an advisory guideline range of 21 to 27 months of imprisonment. The most compelling data point before this Court comes from within the four corners of the Presentence Investigation Report itself. At Paragraph 98, the Probation Department reports the following JSIN data from the U.S. Sentencing Commission:

> *During the last five fiscal years (FY2020–2024), there were 575 defendants whose primary guideline was §2B1.1, with a Final Offense Level of 16 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure. For the 489 defendants (85%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 14 month(s) and the median length of imprisonment imposed was 14 month(s).*

This data is directly on point. It captures defendants sentenced under the identical guideline (§2B1.1), with the identical offense level (16), and the identical criminal history category (I) as Mr. Rahaim. The conclusion is unambiguous: **the average and median sentence for defendants in Mr. Rahaim's precise position is 14 months**—seven months below the low end of the advisory guideline range of 21 months. Furthermore, **15% of similarly situated defendants did not receive a sentence of imprisonment at all.** Mr. Rahaim respectfully submits that he falls squarely within that 15%, given the comparatively modest nature of his PUA fraud, his ability to

2

immediately pay the amount of the PUA restitution[1], his stable employment, and his role as primary caregiver to a 13-year-old child.

A non-custodial sentence for Mr. Rahaim would be consistent with the national norm given the particular facts and circumstances of Mr. Rahaim's conduct. A sentence at or near the guideline range, on the other hand, would place Mr. Rahaim among the more harshly sentenced defendants in this category—despite the fact that, as discussed below, his offense conduct is among the least serious. The defense submits that the JSIN data, combined with the mitigating circumstances detailed herein, supports a non-custodial sentence of time served with a term of home confinement.

## II.    USSC NATIONAL DATA ON GOVERNMENT BENEFITS FRAUD

Beyond the JSIN data specific to Mr. Rahaim's offense level and criminal history, the Sentencing Commission publishes a dedicated "Government Benefits Fraud" Quick Facts report capturing cases sentenced under §2B1.1 involving false claims to federal or state government assistance programs—including Pandemic Unemployment Assistance fraud. The FY2024 data (October 1, 2023 through September 30, 2024) reinforces the case for a below-guideline sentence.

### A. A Majority of Sentences Are Below the Guideline Range

In FY2024, the Commission reported 937 government benefits fraud cases nationally—a 242% increase since FY2020—reflecting the surge in pandemic-related fraud prosecutions. Courts across the country have developed substantial experience with this offense category and have consistently exercised downward discretion:

---

[1] Mr. Rahaim can pay the $15,080 PUA-UI restitution at the time of sentencing and is prepared to do so immediately.

3

| Sentence Type | % of Cases | Avg. Reduction |
|---|---|---|
| Within Guideline Range | 43.1% | — |
| Substantial Assistance Departures | 9.0% | 60.2% |
| Other Downward Departures | 3.8% | 49.2% |
| Downward Variances | 42.6% | 63.9% |
| Upward Variances | 1.4% | 79.5% increase |
| **TOTAL BELOW-GUIDELINE** | **55.4%** | — |

SOURCE: U.S. Sentencing Commission, Government Benefits Fraud Quick Facts, FY2024.[2]

More than half—55.4%—of all government benefits fraud sentences involved some form of below-guideline sentence. The single largest category is downward variances at 42.6%, with an average reduction of 63.9%. This reflects a broad judicial consensus that the guidelines in this offense category overstate the punishment warranted by the conduct. Notably, 31.4% of government benefits fraud defendants received non-custodial sentences—probation, home confinement, or similar alternatives to incarceration—further demonstrating that courts routinely conclude that imprisonment is not necessary to satisfy the purposes of sentencing in this category of cases.

---

[2] **Exhibit 1, Quick Facts**

*B. The Gap Between Guideline Minimums and Actual Sentences Is Significant*

| Fiscal Year | Avg. Guideline Minimum | Avg. Sentence Imposed |
|---|---|---|
| FY2020 | 15 months | 13 months |
| FY2024 | 22 months | 16 months |

SOURCE: U.S. Sentencing Commission, FY 2020–FY 2024 Datafiles.

In FY2024, the average guideline minimum was 22 months—virtually identical to the low end of Mr. Rahaim's range—yet the average sentence actually imposed was only 16 months. That national average incorporates defendants with far more serious conduct and far higher loss amounts. Mr. Rahaim's PUA-specific loss of $15,080 is a small fraction of the national median loss of $137,600.

*C. Mr. Rahaim's Offense Conduct Is at the Lowest End of the Spectrum*

The FY2024 data reports the following profile of the typical government benefits fraud defendant: 71.2% had little or no prior criminal history (Criminal History Category I); the average age was 41 years; 93.3% were United States citizens; and the median loss was $137,600. Notably, 22.6% of cases involved loss amounts exceeding $550,000.

Mr. Rahaim's PUA-specific loss of $15,080 represents approximately one-ninth of the national median loss. While the total agreed loss for guideline calculation purposes is $319,095.36—reflecting the bankruptcy-related conduct—the nature of Mr. Rahaim's offense is qualitatively different from the large-scale, multi-state identity theft rings that dominate PUA prosecutions in this District and nationally. Mr. Rahaim did not steal the identities of third parties. He did not operate a criminal ring. He did not file hundreds of fraudulent claims across multiple

states. He filed claims in his own name, misrepresenting his employment status, for a comparatively modest sum.

## III.    COMPARABLE CASES IN THE EASTERN DISTRICT OF MICHIGAN

The U.S. Attorney's Office for the Eastern District of Michigan has charged over 100 defendants with pandemic-related fraud offenses. A review of publicly reported sentences in PUA wire fraud cases in this District underscores the comparatively modest nature of Mr. Rahaim's conduct:

| Defendant | Loss Amount | AIT[3] Count | Sentence | Key Facts |
|---|---|---|---|---|
| Tracey Dotson | $930,000+ | No | 51 months | Multi-state; stolen IDs; luxury purchases; conspiracy |
| Christopher Niebel | $512,000 | Yes (+24 mo.) | 63 months | Stole IDs from employer; gambling proceeds |
| Daniel Holt | $4.8M scheme | No | 32 months | 10-defendant ring; 700 claims; 9 states |
| **James Rahaim** | **$15,080** | **No** | **Pending** | **Single claimant; own name; no stolen IDs** |

[3] Aggravated Identity Theft

Mr. Rahaim's PUA loss of $15,080 is 1.6% of the Dotson loss ($930,000), 2.9% of the Niebel loss ($512,000), and a negligible fraction of the Holt scheme ($4.8 million). Each of these cases involved sophisticated, multi-state schemes using stolen identities, organized co-conspirators, and—in Niebel's case—the mandatory consecutive 24-month aggravated identity theft enhancement. Mr. Rahaim's conduct is distinguishable in every material respect.

### IV.    THE ZERO-POINT OFFENDER ADJUSTMENT UNDER §4C1.1

As reflected in the Rule 11 Plea Agreement and confirmed in the Presentence Investigation Report at Paragraphs 34 and 73, both the Government and the Probation Department agree that Mr. Rahaim qualifies for the two-level zero-point offender adjustment under §4C1.1. This adjustment, which became effective November 1, 2023, reflects the Sentencing Commission's determination that first-time offenders with zero criminal history points present lower recidivism risk and warrant correspondingly lower sentences.

The USSC's FY2024 data on zero-point offenders confirms the significance of this adjustment. In FY2024, 72.6% of individuals with zero criminal history points received the §4C1.1 adjustment. The average sentence for those receiving the adjustment was 19 months, compared to 89 months for zero-point individuals who did not receive it. Critically, the Commission's application note 10(A) to §5C1.1 directs that for zero-point offenders whose adjusted guideline range falls in Zone A or B of the Sentencing Table, "a sentence other than a sentence of imprisonment … is generally appropriate."

Critically, a probationary sentence can be imposed in this case because the offense of conviction (Wire Fraud, in violation of 18 U.S.C. § 1343) is not a Class A or B felony. USSG §5B1.1(b). In addition, at the time of conviction, the United States Sentencing Commission Guidelines expressly provided that under USSG §5C1.1, Application Note 10(B), "a departure,

7

including a departure to a sentence other than a sentence of imprisonment, may be appropriate if the defendant received an adjustment under §4C1.1 (Adjustment for Certain Zero-Point Offenders) and the defendant's applicable guideline range overstates the gravity of the offense because the offense of conviction is not a crime of violence or otherwise serious offense." *See* USSG §5C1.1, Application Note 9 (*Compare*, Amendment 821, Effective November 1, 2023, and Amendment 836, Effective November 1, 2025).

Mr. Rahaim satisfies every element of this departure provision. He received the §4C1.1 adjustment, as agreed by both parties and confirmed by the Probation Department. Wire Fraud is not a crime of violence. And as demonstrated by the sentencing data discussed herein—including the JSIN data showing a 14-month average sentence, the 15% non-incarceration rate for identically situated defendants, and the 31.4% non-custodial rate in government benefits fraud cases nationally—the advisory guideline range of 21 to 27 months **overstates** the gravity of Mr. Rahaim's offense. The Commission itself has thus provided an express pathway for this Court to impose a non-custodial sentence, and the facts of this case warrant its application.

V.      **THE HISTORY AND CHARACTERISTICS OF JAMES RAHAIM**

Consideration of the "history and characteristics of the defendant" under 18 U.S.C. § 3553(a)(1) supports a sentence below the advisory guideline range. While Mr. Rahaim does not minimize his conduct, his personal circumstances provide important context for this Court's individualized sentencing determination.

*A. Stable Employment and Productive Contribution to Society*

Mr. Rahaim, now 51 years old, has been continuously employed as an Executive Manager at Jackson Nissan in Jackson, Michigan, since June 2019—a position he has held for over six

years. As verified by his paystub and confirmed in the Presentence Investigation Report, he earns approximately $20,583 per month in gross income. His employment is full-time, stable, and lawful. He holds a chauffeur's license and commutes 100 miles each way – approximately one and a half hours in ideal conditions – from his home in Grosse Pointe Shores to the dealership in Jackson, a round trip of 200 miles every working day. This extraordinary daily commitment reflects the depth of his dedication to his livelihood and his determination to provide for his family through lawful employment.

The significance of Mr. Rahaim's role at Jackson Nissan is best understood through the words of the dealership's owner, Joseph Perillo, who writes in his letter to this Court that he appointed Mr. Rahaim as General Manager and placed him in charge of the entire dealership.[4] When the COVID-19 pandemic struck and "affected the entire United States unexpectedly, especially the automobile business," Mr. Perillo states that Mr. Rahaim "somehow was able to operate with a small staff, and he kept the dealership from closing, which saved many jobs and families' lives." *Id.* This is not a defendant who lacks the ability to support himself and his family through legitimate means; this is a defendant who has done so consistently for years and whose work has preserved the livelihoods of others. A sentence of incarceration would jeopardize this employment, the jobs of those who depend on Mr. Rahaim's management, and the income stream from which restitution can and will be paid.

His colleague Nancy Wade, who has worked alongside Mr. Rahaim for the past seven years, similarly attests to his "dedication and commitment" and describes him as demonstrating "strong leadership and a deep sense of community."[5]

---

[4] **Exhibit 2, Letter from Joseph Perillo**
[5] **Exhibit 3, Letter from Nancy Wade**

Prior to Jackson Nissan, Mr. Rahaim and his wife built and operated multiple franchise restaurant locations under the Baby Buford entity, including Tim Hortons and Rally's locations, from 2009 through 2019. As longtime mentor and friend Ara Darakjian—Managing Member of TIR Equities LLC, a real estate investment and development company with over 30 years of experience in Michigan—writes to this Court: "Anyone who has operated a franchise business understands the extraordinary demands it places on a person — the long hours, the responsibility for employees and their families, and the constant need to maintain high standards of service and accountability. James met those demands with consistency and professionalism."[6]

### B. Mr. Rahaim Is the Father of a 13-Year-Old Child

Mr. Rahaim and his wife and co-defendant, Nicole U. Wilski, are the parents of a 13-year-old son, James, who resides with both parents at the family home in Grosse Pointe Shores, Michigan. The parties to the plea agreement have expressly recognized the importance of this child's welfare: the Rule 11 Agreement provides that, if either defendant is sentenced to imprisonment, the terms of imprisonment should be staggered "to allow at least one co-defendant to be home with their minor child."

The character letters submitted to this Court paint a vivid picture of the centrality of this father-son relationship. Joseph Perillo II, the Rahaim family's neighbor in Grosse Pointe Shores for over eleven years, is currently serving as young James's sponsor for his eighth-grade Catholic Confirmation. Mr. Perillo writes that during their Confirmation workshops, he and the boy shared stories, and it was "heartwarming to see little Jim write some of the great stories of his dad."[7] Mr. Perillo states unequivocally that young James "adores his dad" and that "his parents are his world."

---

[6] **Exhibit 4, Letter from Ara Darakjian**
[7] **Exhibit 5, Letter from Joseph Perillo II**

Dominic Valenti, who has known Mr. Rahaim for over forty years, similarly attests that Mr. Rahaim "loves his son deeply and takes his role as a parent seriously," and that "his relationship with his son is central to his life."[8] On a similar note, Mr. Darakjian, who has known the family for over 26 years, describes Mr. Rahaim as "a present and caring husband and father" whose family "is a reflection of the values he holds dear." (Exhibit 4)

A non-custodial sentence for Mr. Rahaim—consisting of time served and a term of home confinement—would best serve this child's interests, and would ensure parental continuity and stability during a critical period in his development.

### C. Physical Health Conditions

The Presentence Investigation Report documents that Mr. Rahaim suffers from diverticulitis (inflammation of the colon causing pain and bowel disturbance), gastroesophageal reflux disease (GERD), and has a history of benign bladder tumors that required surgical removal. While Mr. Rahaim is not currently receiving treatment for these conditions, they are chronic in nature and may require monitoring or medical intervention. The Bureau of Prisons' ability to provide timely and adequate care for these conditions is uncertain, and the Court may consider this factor in determining the appropriate sentence.

### D. Compliance on Pretrial Supervision

Since his release on bond on May 28, 2025, Mr. Rahaim has been fully compliant with all conditions of pretrial supervision. As noted in the Presentence Investigation Report, he has submitted to multiple urinalysis drug screens—all yielding negative results—and has maintained his employment, his residence, and his obligations without incident. This compliance is indicative

---

[8] **Exhibit 6, Letter from Dominic Valenti**

11

of a defendant who is responsive to supervision and who poses no risk of flight or danger to the community.

### E. Acceptance of Responsibility, Voluntary Restitution, and Demonstrated Commitment to Making Amends

Mr. Rahaim has accepted full responsibility for his conduct. He pled guilty on October 15, 2025, pursuant to a written Rule 11 Plea Agreement. Both the Government and the Probation Department agree that he is entitled to the full three-level reduction for acceptance of responsibility under §3E1.1(a) and (b). His acceptance was timely, saving the Government and the Court the resources of a trial. Mr. Rahaim also reflects genuine remorse for the harm his conduct has caused.

In a way, Mr. Rahaim has demonstrated acceptance of responsibility for nearly three years. He has consistently made payments to his bankruptcy creditors in the amount of approximately $3,800 monthly and will continue to do so. These payments are a conscious, sustained commitment to honor the terms of his bankruptcy proceedings and should not be ignored.

Additionally, and as noted *supra*, Mr. Rahaim is prepared to advance the entire sum of the monies owed to the State of Michigan Unemployment Insurance Agency either prior to sentencing, through counsel, or at the time of sentencing. These actions, which include years of payments on prior obligations, as well as the full payment to relative to the Wire Fraud activity demonstrate the strongest possible evidence of Mr. Rahaim's commitment to making amends for his actions.

### F. Passage of Time and Rehabilitation Since Prior Offenses

The defense acknowledges that the Presentence Investigation Report documents prior criminal conduct, including state felony convictions for False Pretenses and Uttering and Publishing in 2003, as well as misdemeanor convictions for domestic violence and disorderly

12

conduct in 2001. The defense does not minimize this history. However, this Court should consider the following mitigating context:

First, **all of Mr. Rahaim's prior convictions are more than twenty years old.** The most recent conviction dates to 2003. His probation was terminated in August 2005—over two decades ago. In the intervening twenty years, Mr. Rahaim built and operated multiple businesses, maintained long-term employment, married, and raised a child. The passage of time and the evidence of rehabilitation are significant mitigating factors under § 3553(a)(1).

Second, **none of Mr. Rahaim's prior convictions resulted in criminal history points under the Sentencing Guidelines.** The Sentencing Commission's own framework—through both the criminal history calculation and the zero-point offender adjustment at §4C1.1—treats Mr. Rahaim as a first-time offender. The Government itself agreed to the application of the §4C1.1 adjustment, which is available only to defendants with zero criminal history points whose offenses do not involve specified aggravating factors. The Commission's data confirms that defendants in this category recidivate at significantly lower rates than other federal offenders.

Third, while the Probation Department's analysis at Paragraphs 93–94 of the Presentence Report characterizes the defendant's history as a "pattern of fraudulent behavior," this characterization must be weighed against the two-decade gap between the prior conduct and the instant offense, the defendant's productive employment history, and the Guidelines' own determination that this prior conduct does not warrant criminal history points. The § 3553(a) factors do not require that the Court sentence a 51-year-old man on the basis of conduct he committed in his twenties, particularly when the Guidelines themselves have discounted that conduct to zero points.

*G. Character, Community Ties, and Compassion for Others*

The defense has submitted six character reference letters from individuals spanning Mr. Rahaim's personal and professional life. Taken together, these letters paint a consistent portrait of a man who, whatever his legal failures, has maintained deep and genuine relationships built on loyalty, generosity, and compassion.

Dominic Valenti, who has known Mr. Rahaim since childhood—a span of over forty years—writes that when Mr. Valenti's own father passed away when Mr. Valenti was just 18 years old, Mr. Rahaim "was there for me during the most difficult period of my life" and "offered steady support, kindness, and understanding without being asked." (Exhibit 6) Mr. Valenti reports that he and Mr. Rahaim speak almost every day, and that Mr. Rahaim consistently asks about Mr. Valenti's aunt, who is battling terminal cancer, offering his support and prayers.

Ara Darakjian, a successful Michigan real estate developer who has known Mr. Rahaim for over 26 years and served as his mentor, describes Mr. Rahaim as possessing "rare humility and self-awareness" and being "unfailingly loyal — to his friends, to his family, and to his commitments." (Exhibit 4) Mr. Darakjian states that he does not use the word "loyalty" lightly, and that Mr. Rahaim "is the kind of person who stands by the people in his life, not only when it is convenient, but especially when it is not."

Mr. Rahaim's aunt, Jeanette Rahaim, who has known him his entire life, writes that he has been a source of guidance and support to her, helping her secure her first car loan and providing a reference letter for her first apartment lease. She describes watching him grow from a child playing

with her three sons into "a responsible adult" and observes that his work ethic and dedication have been constants throughout his life.[9]

These letters are attached hereto and incorporated by reference. They demonstrate that Mr. Rahaim is embedded in a network of family and community relationships that would support his continued rehabilitation and compliance with any conditions of supervision this Court may impose.

## VI.   A BELOW-GUIDELINE SENTENCE IS CONSISTENT WITH 18 U.S.C. § 3553(a)

### A. Nature and Circumstances of the Offense (§ 3553(a)(1))

Mr. Rahaim's unemployment fraud involved filing unemployment claims in his own name while employed, resulting in $15,080 in fraudulent benefits. This is a far cry from the sophisticated, identity-theft-driven, multi-state PUA fraud rings that have been the focus of federal prosecution in this District and nationally. The bankruptcy fraud, while serious, involved misrepresentations about assets—not the creation of fictitious identities or the exploitation of vulnerable victims. The total agreed loss of $319,095.36 is driven primarily by the bankruptcy-related conduct, not the PUA fraud. It merits mention that a significant portion of these funds have already been collected, as is reflected by the Government's request for restitution in the amount of $181,937.87.

### B. Just Punishment and Deterrence (§ 3553(a)(2)(A)–(B))

A sentence of house arrest, combined with supervised release and the restitution obligation of $181,937.87, provides both just punishment and meaningful deterrence. Mr. Rahaim has demonstrated a consistent ability to make good on his payments over the course of the last three years. He understands that this will be a continued obligation. The remaining restitution obligation will follow Mr. Rahaim for years and constitutes a substantial and enduring consequence. A

---

[9] **Exhibit 7, Letter from Jeanette Rahaim**

15

sentence of incarceration, even a significantly reduced one, carries profound collateral consequences: separation from his 13-year-old son, potential loss of the employment from which he is making these payments, and the attendant difficulties of reentry. These consequences are punitive in their own right.

### C. Avoiding Unwarranted Sentencing Disparity (§ 3553(a)(6))

The sentencing data compels a non-custodial sentence to **avoid**—not create—unwarranted sentencing disparity. The JSIN data in the Presentence Report establishes that the average and median sentence for defendants at offense level 16 and criminal history category I under §2B1.1 is 14 months, **and that 15% of such defendants received no imprisonment at all**. The national government benefits fraud data shows that 55.4% of sentences are below the guideline range and that 31.4% of defendants received non-custodial sentences. A within-guideline sentence of 21 months would place Mr. Rahaim in the upper echelon of sentences for this offense category— above the national average—despite the fact that his PUA-specific loss of $15,080 is a fraction of the national median of $137,600, that he has the ability to immediately repay the PUA loss in full, and further that his conduct lacked the hallmarks of the most serious PUA fraud cases: stolen identities, multi-state schemes, organized co-conspirators, and aggravated identity theft charges. A sentence of time served with home confinement would place Mr. Rahaim's sentence within the range of the 15% to 31.4% of similarly situated defendants who received non-custodial outcomes.

### VII.    CONCLUSION

The advisory guideline range of 21 to 27 months does not reflect the sentence that is "sufficient, but not greater than necessary" to comply with the purposes of sentencing set forth in 18 U.S.C. § 3553(a). The JSIN data—reported by the Probation Department itself—confirms that the average and median sentence for defendants in Mr. Rahaim's precise guideline position is 14

months. The national government benefits fraud data confirms that a clear majority of sentences in this category fall below the guideline range. Mr. Rahaim's PUA-specific loss of $15,080 places him at the very bottom of the spectrum of defendants prosecuted for this offense. He is 51 years old, gainfully employed, the father of a 13-year-old son, fully compliant on pretrial supervision, and he has accepted responsibility for his conduct. He continues to make payments towards his debtors and has the means and ability to continue to do so. There is no societal need to interrupt this with a custodial sentence.

For all of these reasons, Mr. Rahaim respectfully requests that this Court impose a non-custodial sentence consisting of a period of time served and a term of home confinement as a condition of supervised release, together with restitution and such other conditions as the Court deems appropriate. Such a sentence would be consistent with the sentences imposed on similarly situated defendants nationwide, would permit Mr. Rahaim to maintain the employment from which he is paying restitution and supporting his family, and would be sufficient but not greater than necessary to comply with the purposes of sentencing under 18 U.S.C. § 3553(a).

In the alternative, should the Court determine that a period of incarceration is warranted, Mr. Rahaim respectfully requests the most minimal custodial sentence this Court deems appropriate taking into account the factors and information set forth above.

[*Signature Page To Follow*]

Respectfully submitted,

Date:   February 10, 2026          */s/ Vincent J. Haisha*
                                   Vincent J. Haisha (P76506)
                                   Flood Law PLLC
                                   155 W. Congress, Ste 350
                                   Detroit, Michigan 48226
                                   (248) 547-1032
                                   vhaisha@floodlaw.com
                                   *Counsel for Defendant James Rahaim*

18

**EXHIBIT LIST**

**Exhibit 1:** Government Benefits Fraud QuickFacts

**Exhibit 2:** Letter of Joseph Perillo, Owner, Jackson Nissan (Employer)

**Exhibit 3:** Letter of Nancy Wade, colleague at Jackson Nissan (7-Year Professional Relationship)

**Exhibit 4:** Letter of Ara Darakjian, Managing Member, TIR Equities LLC, mentor and friend (26-Year Relationship)

**Exhibit 5:** Letter of Joseph Perillo II, neighbor in Grosse Pointe Shores and Confirmation sponsor for defendant's son (11-Year Relationship)

**Exhibit 6:** Letter of Dominic Valenti, childhood friend (40+ Year Relationship)

**Exhibit 7:** Letter of Jeanette Rahaim, aunt (Lifelong Relationship)

## APPENDIX: DATA SOURCES

The sentencing data and statistics cited in this memorandum are derived from the following sources:

1. **Judiciary Sentencing Information (JSIN):** As reported in the Presentence Investigation Report at Paragraph 98, citing the U.S. Sentencing Commission's JSIN database (https://jsin.ussc.gov). FY2020–FY2024 data for §2B1.1 defendants with Final Offense Level 16 and Criminal History Category I.

2. U.S. Sentencing Commission, *Government Benefits Fraud Quick Facts*, FY2024 (published 2025), available at https://www.ussc.gov/research/quick-facts/government-benefits-fraud.

3. U.S. Sentencing Commission, *2024 Sourcebook of Federal Sentencing Statistics*, FY2020–FY2024 Datafiles.

4. U.S. Sentencing Commission, *Zero-Point Individuals Quick Facts*, FY2024, available at https://www.ussc.gov/research/quick-facts/zero-point-individuals.

5. U.S. Sentencing Commission, *Statistical Information Packet: Eastern District of Michigan*, FY2023.

6. U.S. Department of Justice, Eastern District of Michigan Press Releases regarding Pandemic Unemployment Insurance Fraud Sentencings (2023–2025).

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 10, 2026, I electronically filed the foregoing with the

Clerk of the Court using the Court's CM/ECF system.

*/s/ Vincent J. Haisha*
Vincent J. Haisha (P76506)
*Counsel for Defendant James Rahaim*
